## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

OUSMANE BAH,

               Plaintiff,              **Docket No.:** 1:19-cv-03539-PKC

                    v.              **ORAL ARGUMENT REQUESTED**

APPLE INC., et al.,

               Defendants.

_____/

_____

## OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO CITY DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT
_____

**THE TARIQ LAW FIRM, PLLC**
Subhan Tariq, Esq.
34-18 Northern Blvd – Suite 2-25
Long Island City, NY 11101
Telephone: (718) 674-1245
Email: subhan@tariqlaw.com
*Attorney for Plaintiff*

**MALIS|LAW**
Daniel Malis, Esq.
30 2nd Street
Cambridge, MA 02141
Telephone: (617) 491-1099
Email: daniel.malis@malislaw.com
*Attorney for Plaintiff*

## <u>TABLE OF CONTENTS</u>

Procedural History...........................................................................................................1

Statement of Relevant Facts........................................................................................3

    A. Incidents Involving Learner's Permit and False Identification Prior to New
       York.........................................................................................................3

    B. Multiple New York Police Department Officers Catch Mamadou Barrie
       Impersonating the Plaintiff. ...........................................................4

    C. October 2018 Staten Island Thefts. .........................................................6

    D. New York Police Department's Confused Identification of the Plaintiff..................6

    E. Apple and SIS Improperly Tilt the Investigative Scales...........................10

Argument .....................................................................................................................15

  I. Arrests Made Without Probable Cause Are Not Subject to Qualified Immunity.... 15

    A. Detective Reinhold's Disregard of Exculpatory Evidence and Confusion of
       the Actual Perpetrator, Mamadou Barrie, with the Plaintiff, Ousmane Bah,
       is Sufficient Evidence of Reckless Disregard as to Warrant Denial of His
       Motion to Dismiss.........................................................................17

    B. At the Time of Their Arrest of Bah, Detectives Pagan, Patelli, Granata, and
       White Objectively Arrested the Wrong Suspect Based Upon His Physical
       Appearance and Clear Conflict Between the Photograph and Bah.......................20

  II. The Use of Facial Identification Which Improperly Identified Barrie as Bah, and
    Confusion in Booking Records Concerning Bah and Barrie's Identifications, is
    Sufficient Evidence to Support a Claim of the New York Police Department's
    Failure to Ensure That Officers Would Not Identify Offenders Without Probable
    Cause, Warranting Denial of the City's Motion to Dismiss Based on Monell v. Social
    Services of City of New York. ..........................................................21

  III. Use of Mamadou Barrie's Booking Photo to Identify Barrie as Ousmane Bah by the
    New York Facial Identification Section Is Evidence of Improper Policy, Custom,
    Training, or Supervision Warranting Denial of the City's Motion to Dismiss. ........ 24

Conclusion ...................................................................................................................27

# TABLE OF AUTHORITIES

Pages

**Cases**

Alexander v. Hunt, 2018 Lexis 135742 at 13 ............................................................... 23

Ambrose v City of NY, 623 F Supp 2d 454, 464 (SDNY 2009) ................................... 22

Ambrose, supra at 465, citing Nesbitt, 2006 U.S. Dist. LEXIS 88262, 2006 WL 3511377, at *4
..................................................................................................................................... 23

Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 130 n.10 (2d Cir. 2004) (Sotomayor, J.) 23

Benitez v. City of New York, No. 17-CV-3827 (SJ) (SJB), 2018 U.S. Dist. LEXIS 99251, 2018
WL 2973387, at 6 (E.D.N.Y. Jun. 13, 2018) ............................................................ 22

Brandon v. City of New York, 705 F.Supp.2d 261, 277 (S.D.N.Y. 2010) ................... 22

Brandon, 705 F.Supp.2d at 277; Newson v. City of NY, 2019 US Dist LEXIS 143835, at 18-19
[EDNY Aug. 22, 2019, No. 16-CV-6773 (ILG) (JO)] ............................................. 22

Breton v. City of New York, 404 F Supp 3d 799, 818 (SDNY 2019) .......................... 23

Breton v. City of NY, 404 F Supp 3d 799, 811 [SDNY 2019] ............................... 16, 17

Brown v. Daikin Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Iqbal v. Ashcroft, 556
U.S. at 678) .............................................................................................................. 26

Carbajal v. Vil. of Hempstead, 2006 US Dist LEXIS 22411, at *16 [EDNY Mar. 29, 2006, No.
02-CV-4270 (DLI)]) ............................................................................................... 21

Corso v. City of New York, No. 17-CV-6096, 2018 U.S. Dist. LEXIS 161113, 2018 WL
4538899, at 12 (S.D.N.Y. Sept. 20, 2018) ......................................................... 22, 26

Divine Allah v. Goord, 405 F Supp 2d 265, 271-272 [SDNY 2005]. ......................... 15

E.E.O.C. v. Port Auth. of N.Y. and N.J., 768 F.3d 247, 254 (2d Cir. 2014) ............... 23

Escalera v. Lunn, 361 F.3d 737, 744 (2d Cir. 2004) ................................................... 16

Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991) ................................ 16

Hernandez v. United States, 939 F3d 191, 208 [2d Cir 2019] ..................................... 19

Holmes v. County of Montgomery, 2020 US Dist LEXIS 42906, at 21 [NDNY Mar. 12, 2020,
No. 1:19-CV-0617 .................................................................................................. 23

Jenkins v. City of NY, 478 F3d 76, 87 (2d Cir 2007) .................................................. 15

Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999) .................................................... 19

Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995) ..................................................... 21

Lennon v. Miller, 66 F.3d 416, 423-24 (2d Cir. 1995) ............................................... 16

Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) ........................................... 15

Mistretta v. Prokesch, 5 F. Supp. 2d 128, 135 (E.D.N.Y. 1998) ............................... 16

Monell v. Dept. of Social Servs., 436 US 658 (1978) ............................................ 14, 22

Newson, supra, citing Jackson v. Williams, No. 16-CV-1137 (LEK) (CFH), 2017 U.S. Dist.
LEXIS 45184, 2017 WL 1162196, at *2 n. 1 (N.D.N.Y. Mar. 28, 2017) .............. 22

Oliveira v. Mayer, 23 F.3d 642, 647 (2d Cir. 1994) ................................................... 17

Ramos v. City of New York, 285 A.D.2d 284, 729 N.Y.S.2d 678 (1st Dep't 2001) ... 16

Scott v. United States, 436 U.S. 128, 138, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978) ... 16

Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006) ..................................... 22

Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) ........ 24

The REAL ID Act Modification for Freely Associated States Act, 49 U.S.C. 30101; Public Law
109-13, as amended by Public Law 115-323 (2018). ............................................... 3

Tretola v. County of Nassau, 14 F Supp 3d 58, 70 (EDNY, 2014) ............................. 16

Tretola v. Cty. of Nassau, 14 F. Supp. 3d 58, 73 (E.D.N.Y. 2014) ............................................... 16

Tretola, supra, citing Bond v. United States, 529 U.S. 334, 338 n.2, 120 S. Ct. 1462, 146 L. Ed. 2d 365 (2000) ............................................................................................................................ 16

Weyant v. Okst, 101 F.3d 845, 852 (2nd Cir. 1996) ................................................................... 16

**Articles**

*Hauser, Christine, Ohio Man is Shot Dead by a Deputy Searching for Someone Else, The New York Times (December 10, 2020)*……………………………………………………………………….13

**Procedural History**

Plaintiff filed his initial Complaint in this matter on April 22, 2019, alleging injury from Defendants Apple and SIS' false claims that he was a felon in multiple states and had committed thefts at 17 Apple locations. [Docket Entry 1.]  In response, Defendants Apple and SIS filed their first Motion to Dismiss on July 31, 2019. [DE 33 to 38.]  Defendants claimed that any such assertions, even when objectively false, were subject to a qualified "law enforcement" privilege and denied that this Court had jurisdiction over Plaintiffs' defamation and malicious prosecution claims.  As part of their Motion to Dismiss the Complaint, Defendant Security Industry Specialists, Inc (*hereinafter* "SIS"), through counsel, filed an affidavit in which Thomas Stevens, Vice President of Retail Operations for SIS, swore under oath that "SIS did not identify Ousmane Bah to law enforcement in New York State and did not file any report or complaint against him with law enforcement in New York State." *See Affidavit, Docket No. 34-5, Exhibit A.*

This Court denied Defendants' Motions on February 10, 2020 as to the New York claims, finding that the Complaint's detailed allegations were sufficient to raise an issue of whether the claimed privilege was vitiated by malice or reckless disregard for the truth regarding the false allegation of theft in New York. [See DE 49.]  The Court, however, dismissed the claims arising in other states based upon lack of personal jurisdiction, reasoning "[t]he required substantial nexus between the allegedly defamatory statements (in other state) and defendants' New York commercial activities is lacking." [See DE 49.]

In the initial Scheduling Conference, this Court directed that the events in other jurisdictions both before and after the alleged New York events were relevant and probative regarding the Defendants' malice or reckless disregard for the truth or falsity of their multiple claims over 14 months that the Plaintiff was a thief.  [See DE 61.]

On July 1, 2020, Defendants produced emails between Detective Reinhold and John Woodruff of SIS, which established that employees in SIS' New Jersey operations, assisting Apple's corporate office and New York Store, had identified Ousmane Bah by name to the NYPD, demonstrating that SIS' affidavit, signed by SIS VP Thomas Stevens, was false.

Plaintiff sought to file an Amended Complaint on July 15, 2020 to revive the New Jersey-related claims based on this newly discovered evidence.  [See DE 73.]  On August 11, 2020, the Court found a "failure to establish a substantial nexus between the defamation claims arising from the New Jersey Incidents and the defendants' New York commercial activities as required by New York's longarm statute or establish a sufficient connection between the malicious prosecution claims arising from the New Jersey Incidents and the defendants' New York commercial activities as required by due process."[1] [See DE 79.]

Plaintiff filed his Second Amended Complaint on August 27, 2020, adding Detective John Reinhold, the New York Police Department (*hereinafter* "NYPD"), and the City of New York as parties. [See DE 85.] This Court granted leave to Defendants Apple and SIS to file a Second Motion to Dismiss. [See DE 94 and 96.]

Defendants filed their Motion to Dismiss the Second Amended Complaint on October 13, 2020. [See DE 109 to 114.]  Plaintiff filed his response on November 13, 2020, and the matter is fully briefed and pending in front of Your Honor.

---

[1]     Plaintiff has filed a corresponding action in New Jersey, *Bah v. Apple Inc*, et al. 2:20cv-15018-MCA-MAH, based upon this Court's dismissal.  However, on March 25, 2021, the United States Supreme Court, in *Ford Company v. Montana Eighth Judicial District et al*, 141 S. Ct. 1017, broadened the definition of jurisdictional "nexus" to provide jurisdiction even if the specific tortious events did not occur within the state's borders, so long as the alleged tortious acts relate to the general business conducted by those defendants within the state (as previously argued by Plaintiff in its initial memorandum in this matter).

        Given the Supreme Court's recent decision; SIS' perjured affidavit; Apple's contacts from New Jersey to the New York forum and the subsequent arrest in New York; and active discussions between the NYPD and both Apple and SIS' New Jersey representatives concerning strategies and court remedies available for both the New Jersey and New York shoplifting events, Plaintiff will be requesting that the Court take a fresh look at the issue of jurisdiction over both private Defendants through separate letter motion.

The City of New York identified the detectives involved in the arrest of Plaintiff on January 6, 2021.  Plaintiff promptly filed his Third Amended Complaint ("TAC") to add those arresting detectives as Defendants. [See DE 134.]  The City of New York and the individual detectives thereafter filed their Motion to Dismiss on March 26, 2021. [See DE 142.]

## Statement of Relevant Facts

Plaintiff, then a 17-year-old high school student, obtained a learner's permit from the State of New York on March 26, 2018.  The permit consisted of a black-and-white computer printout from the Department of Motor Vehicles detailing his personal information, including height (5'7"), date of birth, eye color, and home address.  Unlike the permanent New York learner's permit, the temporary ID had no corresponding photograph.  Accordingly, the permit stated conspicuously in bold letters: "**THIS TEMPORARY DOCUMENT IS NOT VALID FOR IDENTIFICATION PURPOSES."**  [TAC ¶ 17.]  *See Exhibit B.*  The permit thereafter went missing. [TAC ¶ 18.]

The permanent learner's permit arrived in April 2018, containing the photograph of Bah taken at the time of his application as part of New York's participation in the federal "Real ID" program.  The Plaintiff's photograph was also stored digitally at the New York Department of Motor Vehicles and was available through database search to investigative officers in the City of New York, as well as other states.  *The REAL ID Act Modification for Freely Associated States Act*, 49 U.S.C. 30101; Public Law 109-13, as amended by Public Law 115-323 (2018).

### A.  Incidents Involving Learner's Permit and False Identification Prior to New York.

In April 2018, an individual claiming to be the Plaintiff was detained and arrested at an Apple store in Connecticut in response to an accusation by store employees that the individual had stolen merchandise. [TAC ¶ 22.]  Defendant Apple incorrectly identified the thief as

3

Ousmane Bah, recklessly relying on the thief's lie about his own identity and the unreliable learner's permit to "verify" the identification. [TAC ¶ 23.] The permit, as noted above, stated on its face not to use it for identification purposes, and described Bah as being 5'7" and 17 years old. The thief (later discovered to be Mamadou Barrie) was 6'1" and appeared significantly older than 17. [TAC ¶ 25.]   He in no way resembled the Plaintiff, other than having a Muslim name and being Black.

On May 24, 2018, this same individual was apprehended for shoplifting at an Apple store in Paramus, New Jersey. The thief, Mamadou Barrie, once again identified himself as Ousmane Bah to the apprehending security guard, Steven Yhap of Defendant SIS. [TAC ¶ 30.] SIS provided security services at Apple stores and acted as their agent during the investigation and prosecution of the New Jersey, Connecticut, Massachusetts, and New York thefts.   SIS unreasonably used the unreliable and factually contradicted learner's permit to identify the thief as Bah, although, as noted above, the thief's appearance was significantly different than the person described in the permit. [TAC ¶ 31.] Yhap falsely identified the imposter as Bah to the Paramus Police and promised to provide them with the store's security video showing the theft. [TAC ¶ 34, 37.][2]

## B. Multiple New York Police Department Officers Catch Mamadou Barrie Impersonating the Plaintiff.

On July 17, 2018, NYPD Officer Christopher Latty, Shield #27232 of the 32nd Precinct, observed Mamadou Barrie, the imposter, who was driving a vehicle with a forged license plate. Barrie attempted to identify himself as Plaintiff.  Officer Latty, however, correctly saw through the ruse, arrested Barrie and charged him with False Impersonation, Criminal Possession of a

---

[2]      As this Court is aware, there were multiple further misidentifications between the Paramus arrest and the New York charges.  They are less germane to the City's Motion and are therefore not discussed at length in this opposition.

Forged Instrument, and Forgery in the Third Degree. *See Exhibit C*. This arrest was recorded in the NYPD's computer system. The arrest record, on its face, appeared to conflate Mamadou Barrie's identity with that of the Plaintiff. However, a brief review of the record discloses the apparent error. *See Arrest Record, July 17, 2018, Exhibit D.*

Further, on September 6, 2018, NYPD Officer Ariel Perez observed the imposter, Mamadou Barrie, driving a 2009 Red Audi with illegal window tints. Once again, Barrie attempted to identify himself as Ousmane Bah to Officer Perez. However, Officer Perez, like Officer Latty, saw through the ruse, arrested Barrie, and charged him False Impersonation, Aggravated Unlicensed Operating of a Motor Vehicle, and Driving without a License.

As part of that September 6 arrest, Barrie was cuffed and booked, taken to the precinct, and photographed. The arrest, including Barrie's charge for impersonating the Plaintiff, was entered into the NYPD's booking system, similar to the July 2018 arrest. Once again, this arrest record conflates Barrie's name with the Plaintiff's. However, a very brief review of the charges discloses that Barrie had been arrested for impersonating Bah. *See Arrest Record, September 6, 2018, Exhibit E.* During this arrest, Barrie's "mugshot" was taken and saved in the NYPD's records. Barrie's height is described as 6'1" (again, as opposed to Bah's height of 5'7").

It is reasonable to infer that this mislabeling of a criminal Defendant is a quirk of the New York Police Department booking system, and therefore represents a "custom, practice or policy" of the department which, in no small measure, led to the Plaintiff's false arrest. Such an inaccurate policy, leading to an unconstitutional arrest without probable cause, is of itself grounds for the City's liability under *Monell v. Department of Social Services,* as argued below.

Both of these arrest records were present in the NYPD's booking system and were therefore available to Detective Reinhold.

5



| DETAILS: | | Arrest #: B18640905 |
|---|---|---|

AT TPO AO OBSERVED DEFT DRIVING 2009 RED AUDI NYS PLATE HZU2081 WITH ILLEGAL WINDOW TINTS (26% LIGHT TRANSMITTANCE). UPON LAWFUL CARSTOP DEFT DID NOT HAVE ANY ID AND PROVIDED PEDIGREE INFORMATION THAT REVEALED DEFT TO HAVE A SUSPENDED NYS LICENSE AFTER INVESTIGATION; TOTAL 2 (SCOFFS 2 ON 2 DATES).WHEN INSTRUCTED TO IDENTIFY HIMSELF TO AO AND THAT LYING ABOUT HIS NAME DATE OF BIRTH AND ADDRESS WILL BE ADDITIONAL CHARGE THE DEFENDANT CONTINUED TO GIVE A FALSE NAME AND DATE OF BIRTH. DEPARTMENT DATABASE CHECKS REVEAL DEFT TO BE IDENTIFIED AS BARRIE, MAMADOU 07/08/1998

| DEFENDANT: BAH, OUSMANE | NYSID #: 13252805H | Arrest #: B18640905 |
|---|---|---|

| Nick/AKA/Maiden: | Height: 6FT 1IN | Order Of Protection: NO |
|---|---|---|
| Sex: MALE | Weight: 150 | Issuing Court: |
| Race: BLACK | Eye Color: BROWN | Docket #: |
| Age: 18 | Hair Color: BLACK | Expiration Date: |
| Date Of Birth: 05/10/2000 | Hair Length: NORMAL | Relation to Victim: UNKNOWN/NONE |
| U.S. Citizen: YES | Hair Style: CAESAR | Living together: NO |
| Place Of Birth: | Skin Tone: DARK | Can be Identified: YES |

## C.  October 2018 Staten Island Thefts.

On October 22 and then again on October 24, 2018, the thief committed two more thefts at an Apple store in Staten Island, New York. The thief, Mamadou Barrie, was not identified or apprehended at the store, but his image was captured on the store's video cameras and forwarded to the NYPD.  At this time, neither Apple nor SIS identified the suspect by name to the responding officer.

## D.  New York Police Department's Confused Identification of the Plaintiff.

Defendant Detective John Reinhold of the NYPD was in charge of investigating the Staten Island theft.  On November 8, 2018, he published a bulletin on MetrORCA (a public-private database used to help identify shoplifters) containing the image of Barrie that was captured by security video from the Apple Store. [TAC ¶103.]  On the same day, Detective Reinhold submitted an image of the thief to the NYPD's Facial Identification Section, a division of the Real-Time Crime Center, which responded with two possible matches: Mamadou Barrie

(the person whom on two occasions in New York was arrested for impersonating Ousmane Bah) and the actual Ousmane Bah. [See TAC ¶107.]  *See Facial Identification Section record, Exhibit F.*

The City of New York's rules concerning automated Facial Identification precluded use of this record as grounds for "probable cause."  The Department's internal bulletin notes as follows:

> …[once the] Real Time Crime Center Facial Identification Section (FIS) analyst determines that Subject is **POSSIBLY** the suspect whose image is depicted in the video and / or photograph regarding a crime. A FIS Possible Match does **NOT** constitute a positive identification and does **NOT** establish probable cause to arrest the Subject. Additional investigative steps **MUST** be performed in order to establish probable cause to arrest the Subject.  *See Exhibit G.*

On November 9, 2018, Detective Reinhold activated a SUSPECT ONLY Investigation card for Bah.  Notably, the card warns that "Suspect has given the following names when arrested: Ousmane Bah, Mamadou Barrie, Barrie Mamadou, and Barrie Mamadu."  *See Investigation Card, Exhibit H.*

On November 10, 2018, Detective Reinhold created a photo array for use in identifying the Staten Island thief, to further his investigation and to attempt to obtain probable cause for issuance of an arrest card.  In his creation of the photo array, **Reinhold correctly identified the perpetrator as "Mamadou Barrie."**  *See record creating photo array, Exhibit I.*  This photo array demonstrates that Reinhold was aware at this time that the "real" name of the Apple thief was not Ousmane Bah, but Mamadou Barrie.  **The photo used by Reinhold in this array was Mamadou Barrie's booking photo from his September 6, 2018 arrest for impersonating the Plaintiff, Ousmane Bah.**  *Photo Array, Exhibit J.*

7

On November 11, 2018, in violation of department protocols, Detective Reinhold resubmitted the same image of the Staten Island Thief to the FIS section. [TAC ¶111.] **This submission is evidence of Reinhold's uncertainty regarding the depicted thief's identity.** The image was rejected by FIS as being a duplicate. *See FIS finding, November 11, 2018, Exhibit K.* Although NYPD officers had previously definitively identified the individual in the photograph as Mamadou Barrie; and although these officers had also charged Barrie with impersonating Ousmane Bah in multiple arrests, this second FIS report noted that the photograph showed Ousmane Bah and that Mamadou Barrie was an alias, reflecting both the Police Department and Reinhold's confusion concerning the offender's identity.

Subsequently, on November 13, the photo array prepared by Detective Reinhold was shown by NYPD Detective Centner to Apple's Staten Island store manager, who selected Mamadou Barrie as the perpetrator of the Staten Island theft.  As noted above, the photo in the array was Barrie's booking photo from his September 6, 2018 arrest for impersonating Bah.  As also noted, Reinhold's records regarding the preparation of the photo array also identified the depicted individual as Mamadou Barrie, *not* Ousmane Bah.

However, at some point during or after the preparation of the array, the identification of the person on the photo was changed from Mamadou Barrie to Ousmane Bah.  No explanation for this change was given.  The second page of the array **misidentifies** the depicted individual identified by the store manager as Ousmane Bah, despite the prior arrests of Barrie for impersonating Bah, but acknowledges the photograph taken was from Barrie's September 6 arrest for that impersonation.

On November 13, 2018, therefore, Detective Reinhold had more than enough objective information casting doubt upon the identity of the party he was investigating, either as Ousmane Bah or Mamadou Barrie.  This information included:

- Multiple arrests of Mamadou Barrie for impersonation of Ousmane Bah;

- A Facial Identification Search which provided multiple names for the offender depicted in the security video;

- Reinhold's own preparation of a photographic array for identification purposes in which he correctly named the suspect "Mamadou Barrie";

- The photograph itself, which was taken during Mamadou Barrie's booking for the crime of impersonating Ousmane Bah on September 6, more than two months previously;

- The records of "Ousmane Bah's" arrest in July and October which showed on review that the actual name of the arrested individual was Mamadou Barrie;

- The inexplicable switching of names of the identified suspect from "Mamadou Barrie" (the correct name provided by Reinhold while preparing the photo array) to "Ousmane Bah."

Reinhold also had access to the New York Department of Motor Vehicles' Real ID database, which contained the real Ousmane Bah's photograph.  *See New York City Procedure No. 507-01, dated 12-9-13, Exhibit L.* Had Reinhold consulted that database or any of the other resources available to him, he would have immediately recognized that the real Ousmane Bah did not in any way resemble the Staten Island thief, while pictures of Barrie in the NYPD's own records showed that he was identical to the depicted felon, as shown below:

       

*Photos of Ousmane Bah*                        *Photos of Mamadou Barrie*

The information available in the DMV database also provided Bah's correct height of 5'7" (again conflicting with Barrie's height of 6'1") and age of 18 (contrasted with Barrie's appearance of at least 21). This documentary evidence demonstrates that the identification of Barrie's picture as that of Ousmane Bah was reckless and made in the face of cumulative but erroneous evidence that should have caused a trained and experienced investigator to seriously doubt its accuracy.

Nevertheless, Reinhold ignored this conflicting information and issued a "Probable Cause" card for Ousmane Bah's arrest. The card mentioned that the suspect had offered "Ousmane Bah," "Mamadou Barrie," "Barrie Mamadou," and "Barrie Mamadu" as identifying names when confronted and alleged that Bah had committed the Staten Island thefts. The arrest card was signed both by Reinhold's superior officer and an officer from the Warrants Section. *Arrest Card, Exhibit M.*

**E. Apple and SIS Improperly Tilt the Investigative Scales.**

On November 15, 2018, SIS employee John Woodruff, using the email address provided in the MetrORCA bulletin, wrote Detective Reinhold. Contrary to SIS Vice President Thomas Stevens' sworn affidavit submitted six months later to this Court, Woodruff specifically misidentified the thief depicted in Reinhold's bulletin as Ousmane Bah. Woodruff elicited

Reinhold's cooperation in arresting Bah, even though Reinhold had previously listed the man

depicted in the photograph as Mamadou Barrie in the photo array.  Woodruff's email is below:

> **From:** John Woodruff <jwoodruff@sis.us>
> **Sent:** Thursday, November 15, 2018 1:55:43 PM
> **To:** REINHOLD, JOHN
> **Subject:** Apple Theft- Ousmane Bah
>
> Hi John,
>
>   The below individual is known to us as Ousmane Bah. He has been hitting Apple stores for quite a
> few months now and doesn't seem to be stopping. I am not sure if you have a contact with our Apple
> LP district managers but I recently heard from an Apple manager at Staten Island that you were trying
> to ID him. I can give u whatever I have on his cases and losses we have experienced if you have not
> already gotten it. Looks like he hits from Connecticut to south Jersey. Feel free to reach out to me
> anytime.

Apparently, if the memorandum of the City of New York and individual officers

submitted to this Court is to be believed, this "identification" of the thief as Bah was the basis of

Reinhold's issuance of an arrest "card."  *See Defendant's Memorandum, page 10.*

Woodruff offered to provide Reinhold with the Paramus arrest record, which later

Reinhold acknowledged as received.  The Paramus record showed the suspect misspelling his

own alleged name as "Ousama Bah" and described different physical characteristics from the

real Ousmane Bah.  Rather than casting further doubt on the reliability of the identification,

Reinhold now claims that this emailed discussion led to confirmation of "probable cause" for

Bah's erroneous arrest.

The discussion is also illustrative of Apple and SIS' collaboration in seeking Bah's

arrest and strategies for sentencing.  In response to Detective Reinhold's inquiry as to whether

the suspect had been warned not to trespass in Apple stores, Woodruff reported that "we (Apple)

only verbally trespass them … we get to Court we ask the judge to trespass them for as long as

we can."  Woodruff then asked Reinhold to look into the status of the pending case from the

Paramus apprehension. It is reasonable to infer that rather than noting these red flags of

11

uncertainty which were exculpatory to Bah, Detective Reinhold instead ignored the conflicts and deferred to SIS' inaccurate information.

Following the arrest card, a "wanted" flyer, as well as a NYPD "iCard," was issued for Bah's arrest.  The iCard contained the photograph of Mamadou Barrie along with the charge of theft and authorized Bah's arrest.

On the morning of November 29, 2018, no fewer than four NYPD detectives appeared at Plaintiff's family's home, where he lives with his family, at 4 AM to arrest him. [TAC ¶118.] There were no exigent circumstances or evidence of violence in either the charged crime or in the alleged suspect's record that would warrant the attendance of this many *detectives* as opposed to regular officers.[3]  The detectives had a physical copy of the iCard or flyer with Mamadou Barrie's picture.  The detectives asked to speak to the Plaintiff, who in no way resembled the depicted thief.   [TAC ¶119.] The detectives then performed a room-to-room search of the premises to find the actual thief pictured in the warrant. [TAC ¶120.]  Failing to locate the depicted offender, they apparently chose the next best thing: they arrested the Plaintiff; handcuffed him; and put him, surrounded by the four detectives, in the back of a squad car; and then drove him an hour to the Staten Island Police Station to deliver him to Detective Reinhold, who was waiting at the station.[4]

Reinhold took one look at the Plaintiff, immediately realized he was not the claimed shoplifter, and released the Plaintiff from custody. When the Plaintiff asked Reinhold how he had been identified, Reinhold (falsely) stated that Apple had identified him, "likely" through use

---

[3]      These circumstances are highly suspect, and discovery with the City of New York will explore why so many detectives were called at 4 AM to make a misdemeanor shoplifting arrest of a 17-year-old alleged offender with no record of violence under any variation of the names listed by Detective Reinhold.

[4]      Why Reinhold was ready and waiting at the station at 5 AM to apprehend a shoplifter may also be a topic for further inquiry.

of automated facial identification.[5]   [TAC ¶126-127.]   Given Plaintiff's acquaintance with the thief (as if knowing someone precludes the possibility of identity theft), Corporate Defendants claim that Plaintiff could have mitigated his damages by confirming his suspicions that Mamadou Barrie had stolen his temporary learner's permit and turning him over to authorities.[6]



Plaintiff's apprehension and custody have caused him significant dismay and emotional distress.  He continues to take medication based upon the stress of being falsely accused of a crime at his home in the small morning hours in front of his family by a large group of strangers who ignored their own arrest information and took him, in handcuffs, into a custody for a crime he did not commit.   The arrest, combined with the multiple objectively false charges sought against him by Apple and SIS in multiple states, significantly impeded his application for United

---

[5]       The evidence currently indicates that it was in fact the NYPD's own Facial Identification Section that used this technology to misidentify the Plaintiff as Mamadou Barrie, based upon the Department's failure to accurately discern between the Plaintiff, an innocent 17-year-old, and the actual thief, who had been twice arrested for impersonating the Plaintiff and had arrest records for those specific crimes in the Department's system.

[6]       As noted in Plaintiff's Opposition to Apple and SIS' Motion to Dismiss, this "burden to mitigate" a false arrest, acknowledged nowhere in law, has no place in today's world, in which Black men are shot and killed by police  even for minor misdemeanors such as traffic stops, and even when the police are searching for other perpetrators. (See, e.g., Hauser, Christine, Ohio Man is Shot Dead by a Deputy Searching for Someone Else, The New York Times (December 10, 2020)).  Given recent revelations and Court decisions noting that conventional inferences from a suspect's interaction with the police no longer apply due to racial profiling, and the fear of interaction with law enforcement of any Black person, much less a Black teenager, Bah's reluctance to come forward with any information after being arrested in the middle of the night for crimes he did not commit seems quite reasonable.

States citizenship, leaving him in fear of deportation, and has had significant negative impacts upon his reputation and future employment.

Although false arrest, malicious prosecution, and lack of probable cause for custody and deprivation of liberty are well-recognized bases for claims of deprivation of civil rights under the Fourth Amendment and 42 USC §1983 *et seq*., the individual detectives seek dismissal of this action, claiming that the Complaint's allegations showing circumstances warranting "serious doubt" of the accuracy of their identification are subject to qualified immunity. Further, despite the significant errors in the arrest record of the actual imposter, by which a man charged with assumption of a false identity is charged in the City's booking system under the name of the impersonated victim, the City of New York claims that the Complaint does not state sufficient facts to allow for a claim under *Monell v. Dept. of Social Servs*., 436 US 658 (1978), that the City's policies and procedures were violative of the Plaintiff's civil rights under 42 USC §1983.

Plaintiff now opposes these motions. As to Detective Reinhold, his failure to note the correct name for the suspect; his evident confusion of the suspect's aliases with the Plaintiff's name in preparation of the photo array; and his delegation of investigative authority to Apple and SIS in the identification of the Plaintiff show that he lacked probable cause to undertake the arrest of the Plaintiff for Barrie's shoplifting in New York, which is of itself evidence of the requisite malice or recklessness to sustain a claim for false arrest.

As to the remaining individual arresting detectives, their decision to ignore the clear inconsistency between the photographs of the actual perpetrator and the Plaintiff's appearance further demonstrates a near-conscious decision to ignore contrary evidence and simply arrest the Plaintiff and take him into custody, again showing a lack of probable cause in so doing. As to the City of New York, the evident confusion of names in Barrie's booking for impersonation of

Bah, which resulted in computer records charging Bah with impersonating himself, is ample evidence of a flawed system which injured Bah's civil rights, again giving rise to relief and warranting denial of the Defendants' Motions.

## Argument

This Court is well acquainted with the standard of review of Defendants' Motion to Dismiss pursuant to Rule 12(b)(6). "The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case." Evaluating a motion to dismiss under Rule 12(b)(6) requires the court to accept as true all material allegations of the complaint. "The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." A motion to dismiss may be granted only if, after "it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief.'" *Divine Allah v. Goord*, 405 F Supp 2d 265, 271-272 [SDNY 2005].

### I.   Arrests Made Without Probable Cause Are Not Subject to Qualified Immunity.

There is no doubt that the Constitutional right to be free from arrest without probable cause under the Fourth Amendment was clearly established at the time of Mr. Bah's arrest. *Jenkins v. City of NY*, 478 F3d 76, 87 (2d Cir 2007), citing *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000). Therefore, as with the arrest in *Jenkins*, Plaintiff's false arrest claim turns on whether the detectives' probable cause determination was "objectively reasonable." *Jenkins, supra.*   An officer's determination is objectively reasonable if there was "arguable" probable cause at the time of arrest – that is, if "officers of reasonable competence could disagree on whether the probable cause test was met." *Lennon v. Miller*, 66 F.3d 416, 423-24 (2d Cir.

1995); *see also Escalera v. Lunn*, 361 F.3d 737, 744 (2d Cir. 2004) *and Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991).

"[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2nd Cir. 1996).   However, "[a]lthough it is true that police officers do not have an independent 'duty to investigate an exculpatory statement of the accused,'" *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 135 (E.D.N.Y. 1998), a "police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest." *Tretola v. Cty. of Nassau*, 14 F. Supp. 3d 58, 73 (E.D.N.Y. 2014). "**Of particular relevance, the courts have stressed that, in determining whether an arrest is justified, an officer may not disregard plainly exculpatory evidence**." *Breton v. City of NY*, 404 F Supp 3d 799, 811 [SDNY 2019*], and cases cited.* "[A] failure to make further inquiry when a reasonable person would have done so may evidence a lack of probable cause." *Id.* (*quoting Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678 (1st Dep't 2001)).

The standard of review is objective, not subjective. *Tretola v. County of Nassau*, 14 F Supp 3d 58, 70 (EDNY, 2014), *citing Scott v. United States*, 436 U.S. 128, 138, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978) (*emphasis added*)  ...  "[T]he subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment ... the issue is not his state of mind, but the objective effect of his actions." *Tretola, supra, citing Bond v. United States*, 529 U.S. 334, 338 n.2, 120 S. Ct. 1462, 146 L. Ed. 2d 365 (2000).

"[E]ven if bystander witnesses are considered presumptively reliable, a report of a crime alone will not necessarily establish probable cause." *Breton v. City of NY*, 404 F Supp 3d 799,

811 [SDNY 2019]), *citing Oliveira v. Mayer*, 23 F.3d 642, 647 (2d Cir. 1994) *(citations omitted)*.  Should an arresting officer, or one determining probable cause, have evidence which would cause a reasonable officer to entertain serious doubts of the accuracy of the allegation or accusation, he has failed to establish probable cause and may therefore be legally responsible for the accused's false arrest.

> **A.   Detective Reinhold's Disregard of Exculpatory Evidence and Confusion of the Actual Perpetrator, Mamadou Barrie, with the Plaintiff, Ousmane Bah, is Sufficient Evidence of Reckless Disregard as to Warrant Denial of His Motion to Dismiss.**

As to Detective Reinhold, his swapping of the names of Mamadou Barrie (the actual perpetrator) and Ousmane Bah (the victim whom he impersonated) in his investigative materials should have alerted him that his identification of Bah as the thief was unreliable, and that his issuance of a probable cause finding and "arrest card" therefore was wrongful.  As noted in the Complaint and verified by the attached documentation from the investigation record, Reinhold obtained information from the Facial Identification Section indicating that the photograph provided by Apple and SIS was of "Ousmane Bah," with aliases of Mamadou Barrie and variants on that name.  However, official New York policy did not allow him to rely upon this identification as probable cause for arrest.

Accordingly, Reinhold prepared a photographic array of six pictures of potential offenders to provide the Apple Store manager from Staten Island to identify the perpetrator. During this preparation, Reinhold correctly identified the suspect's picture as that of **"Mamadou Barrie" – not Ousmane Bah.**  The photograph array shows that the picture Reinhold used was from Barrie's September 6, 2018 arrest for impersonating Ousmane Bah.  Given that the picture was available and that Reinhold correctly identified the individual in that picture, it is a reasonable inference (which, for purposes of this Motion, this Court is required to draw) that

Reinhold also had available the actual booking record from that arrest, which specifically noted that the depicted offender had been arrested for that impersonation.[7]

However, Reinhold **ignored his own identification of the photographed suspect** upon return of the photographic array in which Barrie's picture was identified, and instead noted that the photographed offender was named Ousmane Bah. This inconsistency alone, combined with the booking sheet showing that Barrie was impersonating Bah at the time of his arrest on September 6, should have caused sufficient uncertainty for Reinhold to withhold charging Bah until this confusion of names was corrected.

Indeed, the ensuing events in the investigation indicate that Reinhold's disregard of this exculpatory evidence was due to his delegation of his responsibility of finding probable cause to the private Defendants seeking his arrest – Defendants Apple and SIS, through the misinformation provided by New Jersey SIS employee John Woodruff in his November 15 email to Reinhold. In a bit of sleight of hand, the Defendants' Motion to Dismiss concedes this, likely to avoid the fact that Reinhold's previous identification of the thief as "Mamadou Barrie," and the September 6 booking and resulting photograph, was sufficient exculpatory evidence to cause Reinhold to decline to find probable cause without further inquiry. Again, while the Court may feel that a jury would accept this conflicting evidence as sufficient "probable cause" for Bah's arrest – even in the context of two traffic officers' independent findings that Barrie was impersonating Bah in the official record – this Court's role at this initial juncture is not to adjudicate the matter and deprive Bah of the opportunity to have the jury make such a determination.

---

[7]    As noted in the factual discussion supra, there is a particularly strong inference given that the September 6, 2018 booking sheet erroneously listed the suspect's name as "Ousmane Bah" while charging Mamadou Barrie with impersonating Bah – an error in record-keeping which Plaintiff argues separately is grounds for a denial of the City's Motion to Dismiss under *Monell. See Argument, infra.*

Indeed, the record indicates that prior to his finding of "probable cause," Reinhold not only maintained serious doubts regarding the thief's identity but also had multiple ways to resolve those doubts.  When the first FIS search disclosed multiple names for the photographed suspect, Reinhold resubmitted the request to FIS, resulting in a rejection of the search request under FIS regulations. It is reasonable to infer (and, in fact, likely) that his resubmission of the search request reflected Reinhold's state of mind that he was at minimum unclear as to the suspect's identity at that time.

In so resubmitting and taking no further steps to reliably identify the perpetrator, Reinhold also ignored a powerful tool for reliably identifying the suspect.  Reinhold could have simply verified Bah's appearance by requesting the Department of Motor Vehicles' photograph of Bah from the NYPD's Real-Time Crime Center, which houses the Facial Identification Section.  Use of such a resource would comport with FIS' requirement of "additional investigation" beyond a positive facial match in order to establish probable cause for an individual's arrest.  *See FIS Guidelines, Exhibit G*.  "Where there is a discrepancy … [which] can be verified with minimal effort, the City is not free to ignore a claim of innocence." *Hernandez v. United States*, 939 F3d 191, 208 [2d Cir 2019] *citing Kuehl v. Burtis,* 173 F.3d 646, 650 (8th Cir. 1999).  "An officer need not conduct a mini-trial before making an arrest, but **probable cause does not exist when a minimal further investigation would have exonerated the suspect**." *Id*.

Had Reinhold submitted Bah's *name* to the Real Crime Center after receipt of the FIS analysis, Bah's learner's permit photograph, which as noted above in no way resembled the thief, would have immediately showed Reinhold that he had named the wrong suspect and instead picked one of the two names available to him for arrest without any reliable identifying

information.  An arrest card or warrant based upon arbitrary selection of one identified suspect is

tantamount to ignoring exculpatory evidence, warranting a finding at this juncture of lack of

probable cause, a lack of qualified immunity, and denial of Detective Reinhold's Motion to

Dismiss.

> **B.  At the Time of Their Arrest of Bah, Detectives Pagan, Patelli, Granata, and White Objectively Arrested the Wrong Suspect Based Upon His Physical Appearance and Clear Conflict Between the Photograph and Bah.**

Throughout this investigation, the individual Detectives relied upon identification of the

suspect by visual means, and the arrest card and flyer carried by Pagan, Patelli, Granata, and

White at the Plaintiff's home showed a photograph of the actual perpetrator.  They then

confronted an individual named Ousmane Bah who looked *nothing remotely like the person*

*described or depicted in the arrest documentation*.  He was shorter, darker, younger, and with

completely different facial features than the thief they were dispatched to arrest.  As noted in the

Third Amended Complaint, this disparity in appearance prompted the Detectives to conduct a

room-to-room search of the Bah house, trying to find the man depicted in their arrest

information.  Indeed, when Bah was brought to the police station after being taken from his bed

in handcuffs and driven an hour to Staten Island, Detective Reinhold realized the arresting

officers' error (as well as his own) and immediately released the Plaintiff without further

criminal action, thereafter voiding the arrest card and probable cause finding.

These arresting officers' bullheaded refusal to acknowledge that the man in front of

them, positively identified at this point as Ousmane Bah, was the man who had committed the

thefts depicted in their arrest documentation, and insistence upon arresting and confining him

was clearly, to the point of being without doubt, objectively wrong on its face.  Bah's arrest was

not at all of a lookalike, and Ousmane Bah was no Sidney Carton, and Mamadou Barrie no

Charles Darnay[8]; the detectives had the wrong man and showed every sign of deliberate indifference to this evident distinction and therefore to Bah's Fourth Amendment rights not to be arrested absent probable cause.  An arrest lacking such objective probable cause is by itself evidence of malice or reckless disregard for the accuracy of the arrest, warranting denial of a Motion to Dismiss based upon qualified immunity – SIS employee Woodruff's contradictory and speculative identification notwithstanding.

This is especially true at the juncture of a Motion to Dismiss at the beginning of the case, much less at any other procedural juncture in this matter, where inferences concerning appearance must be drawn in the Plaintiff's favor.  As the Court noted in *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir. 1995):

> Although, based on the court's review of the pictures of plaintiff as provided by the parties, there are arguably some resemblances between plaintiff and the man on the videotape, a jury could conclude that the two men are so dissimilar that reasonable officers would not disagree on whether to arrest plaintiff when faced with the evidence available. In sum, a "reasonable trier of fact could find that the defendants' actions were objectively unreasonable …[u]nder the totality of circumstances, the court is unable to determine as a matter of law that the individual defendants are entitled to qualified immunity, and the matter should be submitted to a jury."  *Id., citing Carbajal v. Vil. of Hempstead,* 2006 US Dist LEXIS 22411, at *16 [EDNY Mar. 29, 2006, No. 02-CV-4270 (DLI)]).

## II.   The Use of Facial Identification Which Improperly Identified Barrie as Bah, and Confusion in Booking Records Concerning Bah and Barrie's Identifications, is Sufficient Evidence to Support a Claim of the New York Police Department's Failure to Ensure That Officers Would Not Identify Offenders Without Probable Cause, Warranting Denial of the City's Motion to Dismiss Based on Monell v. Social Services of City of New York.

To state a claim for municipal liability under *Monell v. Dept. of Social Servs.*, 436 US 658 (1978), a plaintiff is required to allege "(1) a municipal custom, policy, usage, or practice that (2) is the 'moving force' behind the constitutional violation that he experiences." *Corso v.*

---

[8]     Dickens' protagonists in *A Tale of Two Cities*, in which Carton willingly goes to the gallows to save Darnay, with whom he looks uncannily alike and for whom he is often mistaken.

*City of New York*, No. 17-CV-6096, 2018 U.S. Dist. LEXIS 161113, 2018 WL 4538899, at 12 *(S.D.N.Y. Sept. 20, 2018) (citations omitted)*. A plaintiff can satisfy the municipal policy requirement by alleging "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware." *Benitez v. City of New York*, *No. 17-CV-3827 (SJ) (SJB), 2018 U.S. Dist. LEXIS 99251, 2018 WL 2973387, at 6 (E.D.N.Y. Jun. 13, 2018) (quoting Brandon v. City of New York, 705 F.Supp.2d 261, 277 (S.D.N.Y. 2010))*. The plaintiff may also show "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Id. (quoting Brandon*, 705 F.Supp.2d at 277; *Newson v. City of N*Y, *2019 US Dist LEXIS 143835, at 18-19 [EDNY Aug. 22, 2019, No. 16-CV-6773 (ILG) (JO)])*.  While *Monell* does not provide a separate cause of action for the failure by the government to train its employees, "it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Ambrose v City of NY, 623 F Supp 2d 454, 464 (SDNY 2009) , citing Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006)."*

"The pleading standard for *Monell* claims is no greater than for any other claim subject to Federal Rule of Civil Procedure 8(a)." *Newson, supra, citing Jackson v. Williams*, No. 16-CV-1137 (LEK) (CFH), 2017 U.S. Dist. LEXIS 45184, 2017 WL 1162196, at *2 n. 1 (N.D.N.Y. Mar. 28, 2017) (further citations omitted)*.   A plaintiff cannot satisfy this standard by stating in conclusory manner that a public defendant has failed to train or supervise its officers, or that a custom or usage occurred which violated a victim's Constitutional rights. *Id.*  However, in reviewing a *Monell* claim at the outset of litigation, the Court should be mindful that public

records which would establish such a policy are not immediately available to a suing Plaintiff prior to the commencement of discovery.  *Breton v. City of New York*, 404 F Supp 3d 799, 818 (SDNY 2019).

Indeed, this is particularly true regarding allegations of negligent training and supervision.  It "is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage." *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004) (Sotomayor, J.). Accordingly, courts have upheld failure to train claims when plaintiffs list similar civil rights complaints that support a plausible inference that the City had a training deficiency of which it was aware. *See, e.g., Alexander v. Hunt*, 2018 Lexis 135742 at 13 ("While Alexander will certainly need to identify a specific deficiency in the Town's training programs to prevail at trial or on summary judgment, a plaintiff 'need not allege facts establishing each element of a prima facie case . . . to survive a motion to dismiss.'" *E.E.O.C. v. Port Auth. of N.Y. and N.J.*, 768 F.3d 247, 254 (2d Cir. 2014). As the Court noted in *Alexander*, "It is enough for the complaint to 'assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible.'" *Id.* (internal alterations, citation, and quotation marks omitted); *see also Holmes v. County of Montgomery*, 2020 US Dist LEXIS 42906, at 21 [NDNY Mar. 12, 2020, No. 1:19-CV-0617.  Rather than dismissal at the outset of a case, "it is up to the 'liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.'" *Ambrose, supra* at 465, citing *Nesbitt*, 2006 U.S. Dist. LEXIS 88262, 2006 WL 3511377, at *4 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)).

**III.    Use of Mamadou Barrie's Booking Photo to Identify Barrie as Ousmane Bah by the New York Facial Identification Section Is Evidence of Improper Policy, Custom, Training, or Supervision Warranting Denial of the City's Motion to Dismiss.**

The City of New York's use of automated Facial Recognition has come under heavy criticism for its lack of safeguards, reliability, and unidentified training methods by the press and by the American Civil Liberties Union.  The ACLU only recently obtained thousands of pages of documents through New York's Freedom of Information Law which redacted any references to how operators were trained or by what methods authentication of identification information was obtained.  Indeed, the division's own bulletins indicate that any findings made by this division do not constitute probable cause for arrest and that detectives must use other reliable means for identification of suspects before probable cause can be found.

The concerns regarding the training of New York's Facial Identification Section ("FIS") were publicly enumerated in a 2019 study posted by the American Civil Liberties Union entitled "Garbage In, Garbage Out."  The study noted,

> The stakes are too high in criminal investigations to rely on unreliable — or wrong — inputs. It is one thing for a company to build a face recognition system designed to help individuals find their celebrity doppelgänger or painting lookalike for entertainment purposes. It's quite another to use these techniques to identify criminal suspects, who may be deprived of their liberty and ultimately prosecuted based on the match. Unfortunately, police departments' reliance on questionable probe photos appears all too common.
>
> (*A copy of this study, published online, is appended to this Memorandum as Exhibit N*).

The study noted the following errors in procedure by New York police officers attempting to use evidence generated by the Facial Identification Section:

> The NYPD guide states: "Additional investigative steps must be performed in order to establish probable cause to arrest the Subject [sic]" of the face recognition search.   But what or how many additional steps are needed, and how independent they must be from the face recognition process, is left undefined.

24

Absent this guidance, the reality is that suspects are being apprehended almost entirely on the basis of face recognition "possible matches." For example:

- In a recent case, NYPD officers apprehended a suspect and placed him in a lineup solely on the basis of a face recognition search result. The ultimate arrest was made on the basis of the resulting witness identification, but the suspect was only in the lineup because of the face recognition process.

- NYPD officers made an arrest after texting a witness a single face recognition "possible match" photograph with accompanying text: "Is this the guy…?" The witness' affirmative response to viewing the single photo and accompanying text, with no live lineup or photo array ever conducted, was the only confirmation of the possible match prior to officers making an arrest …

There are probably many more examples that we don't know about. These represent a fraction of the cases that have used face recognition to assist in making an identification. The NYPD made 2,878 arrests pursuant to face recognition searches in the first 5.5 years of using the technology.

   -- "Garbage In, Garbage Out," American Civil Liberties Union study, May 16, 2019

The allegations of this Complaint, in combination with the NYPD's booking policies that listed Bah's name as the accused when Mamadou Barrie was arrested for impersonating Bah, creates an evidentiary record from which the Court may infer a lack of sufficient training.  It is clear from the Complaint that Detective Reinhold confused the names of the two from an early stage, in part from FIS' indication that the store video and video still was not Barrie, but Ousmane Bah (using the name of "Mamadou Barrie" or other variants), when the arrest records for Barrie clearly indicated that *he was arrested for pretending to be Bah*.  The lack of training or sophistication in dealing both with facial recognition and the City's own booking practices became even clearer when Reinhold used that information to issue a suspect card in Bah's name. It became even clearer that the City's officers did not know how to authenticate identification information when Reinhold, with a suspect card listing Bah as a suspect, prepared a facial array

for Apple review which his record indicated was of Mamadou Barrie, but which on its second page listed Barrie's photograph as belonging to Ousmane Bah.

The facts from Barrie's two arrests that erroneously listed Bah as the arrestee also demonstrate evidence of a "practice or policy" of the NYPD to identify victims of impersonation as the offender.  This practice foreseeably led to the misidentification of Bah by the Facial Identification Section (indeed, "garbage in, garbage out") and the substitution of Barrie's picture with Bah's name on the facial array, which directly led to Bah's wrongful arrest.  Such facts, standing on their own, tend to support Plaintiff's claim that his arrest was not the result of a freak error, but of a municipal custom, policy, usage, or practice that (2) is the "moving force" behind the constitutional violation that he experiences. *Corso v. City of New York*, No. 17-CV-6096, 2018 U.S. Dist. LEXIS 161113, 2018 WL 4538899, at 12 (S.D.N.Y. Sept. 20, 2018).  At the very least, such allegations are substantively greater than mere "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements …"  *Brown v. Daikin Am., Inc.*, 756 F.3d 219, 225 (2d Cir. 2014) (*quoting Iqbal v. Ashcroft*, 556 U.S. at 678).

Moreover, Reinhold's failure to submit Ousmane Bah's name to the Real Time Crime Center for his DMV photograph after receipt of the FIS documentation, and his apparent own confusion regarding the name of the offender for whom he prepared the Facial Array for Apple's employee's review, provides more than "threadbare" evidence of a failure to properly train an investigative officer with the ill-defined "further investigation" required to verify a suspect's identity.  As noted, the Real Time Crime Center had access in 2018 to the Plaintiff's actual photograph, and an inquiry to that section would have immediately disclosed that the suspect's picture did not actually match Ousmane Bah's appearance.  Furthermore (and perhaps most damning), four detectives, one of whom is in charge of the Warrants section, arrested someone

who clearly did not resemble the suspect. That by itself is evidence of either poor training or custom.  Such evidence in the Complaint is sufficient to "nudge" the allegations concerning training from "speculative" to "plausible" warranting denial of the City's Motion to allow discovery to further explore the City's use of FIS and requirement of "further investigation" to determine probable cause.[9]

The allegations in the Plaintiff's Complaint, together with the favorable inferences which must be drawn in reviewing the City's Motion to Dismiss, support an allegation that Plaintiff's false arrest resulted in part from practices, policies, and procedures of the New York Police Department, or from a lack of training and supervision of its officers.  The City's Motion to Dismiss must therefore be DENIED.

## Conclusion

In conclusion, Plaintiff's detailed Third Amended Complaint, and the favorable inferences from the facts alleged therein, has provided significant evidence of the arresting officer's indifference to the accuracy of their arrest of Bah, and therefore a lack of probable cause.  Moreover, the Complaint states enough facts to "nudge" Plaintiff's claims of lack of training and a custom or policy concerning verification of a suspect's identity from the speculative to the "plausible."  Therefore, the Defendants' Motions to Dismiss should be DENIED.

---

[9]      Indeed, it is in the public interest for this Court to allow discovery to proceed on Plaintiff's *Monell* claim. As the ACLU noted in its study, there is little information indicating what "additional investigation" would be required to elevate an FIS search from "possibility" to probable cause in the advisory memorandum, which would constitute the "training materials" for Detective Reinhold and others using the technology.  On as important a matter as identification of a criminal, this Court should be loath to defer the investigative process to the "black box" of technology.  To the contrary, in such circumstances, as Franklin once noted, "sunlight is the best disinfectant."  It is vital to protect Fourth Amendment rights of suspects for the Court to subject whatever process used by the police to identify a suspect with reliability to rigorous evaluation.

Dated: April 22, 2021

Respectfully submitted,

_____

Subhan Tariq, Esq.
Attorney I.D.# ST9597
The Tariq Law Firm, PLLC
**Attorney for Plaintiff**
34-18 Northern Blvd – Suite 2-25
Long Island City, NY 11101
Telephone: (718) 674-1245
Email: subhan@tariqlaw.com

_____

Daniel Malis, Esq., BBO # 315770
MALIS|LAW
30 2nd Street
Cambridge, MA  02141
(617) 491-1099
daniel.malis@malislaw.com